**UNITED STATES of America,
Appellee,**

**v.**

**James J. McDERMOTT, Jr.,
Defendant–Appellant,**

**Kathryn B. Gannon, also known as Kathryn B. Gannon Akahoshi, also known as Marylin Star, and Anthony P. Pomponio, Defendants.**

**Docket No. 00–1572.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 29, 2001.

Decided March 29, 2001.

---

Robert J. Anello, New York, NY, (Morvillo, Abramowitz, Grand, Iason & Silberberg, PC, of counsel), for Defendant–Appellant.

James J. Benjamin, Jr., Assistant United States Attorney, New York, NY, (Mary Jo White, United States Attorney, Jamie L. Kogan, Assistant United States Attorney, of counsel), for Appellee.

Before OAKES, STRAUB and POOLER, Circuit Judges.

OAKES, Senior Circuit Judge:

Defendant James J. McDermott appeals from a judgment entered against him in the United States District Court for the Southern District of New York following a jury trial before Kimba Wood, *Judge,* convicting him of conspiracy to commit insider trading in violation of 18 U.S.C. § 371 and of insider trading in violation of 15 U.S.C. §§ 78j(b) and 78ff and of 17 C.F.R. § 240.10b–5. On appeal, McDermott contends principally that (1) the evidence was insufficient as a matter of law to support his convictions; (2) he was unfairly prejudiced as a result of variance between the indictment and the proof at trial; and (3) the district court abused its discretion under Federal Rule of Evidence 403. We agree that there is insufficient evidence to support the conspiracy count, although sufficient evidence exists to support McDermott's conviction on the substantive offenses. Nevertheless, because of the variance between the single conspiracy charged in the indictment and the proof adduced at trial, we find that McDermott was prejudiced to the point of being denied a fair trial. Accordingly, we reverse the conspiracy count and remand for a new trial on the substantive counts.

*BACKGROUND*

The present prosecution arose out of a triangulated love affair involving the president of a prominent investment bank, a pornographic film star and a New Jersey businessman.

Until May 1999, McDermott was the president, CEO and Chairman of Keefe Bruyette & Woods ("KBW"), an investment bank headquartered in New York City that specializes in mergers and acquisitions in the banking industry. Around 1996, McDermott began having an extramarital affair with Kathryn Gannon. Gannon was an adult film star and an alleged

prostitute who performed using the stage name "Marylin Star." During the course of their affair, McDermott made numerous stock recommendations to Gannon. Unbeknownst to McDermott, Gannon was simultaneously having an affair with Anthony Pomponio and passing these recommendations to him. Although neither Gannon nor Pomponio had extensive training or expertise in securities trading, together they earned around $170,000 in profits during the period relevant to this case.

The government indicted McDermott, Gannon and Pomponio for conspiracy to commit insider trading and for insider trading on the theory that McDermott's recommendations to Gannon were based on non-public, material information.[1] McDermott and Pomponio were tried together, but Gannon was not present.

The evidence at trial concerned primarily the relationship between McDermott and Gannon and the trading activities of Gannon and Pomponio. The Government built its case against McDermott almost entirely on circumstantial evidence linking records of telephone conversations between McDermott and Gannon with records of Gannon's and Pomponio's trading activities. Telephone records revealed that McDermott and Gannon engaged in approximately 800 telephone calls during the charged period, including up to 29 calls in one day. Trading records revealed correlations between the telephone calls and stock trades. In addition to these records, the sensational highlight of the government's evidence, which formed the basis of its perjury count against Pomponio, consisted of audiotape recordings of Pomponio's SEC deposition. These tapes undermined Pomponio's defense and credibility, as they recorded him poorly telling lies, evading questions and affecting incredulous reactions.[2] McDermott was sentenced to eight months' imprisonment, to be followed by a two-year term of supervised release, a $25,000 fine and $600 in special assessments.

## DISCUSSION

### A. Legal Sufficiency

McDermott challenges the sufficiency of the evidence to establish his convictions both for a single conspiracy to commit insider trading and for the related substantive offenses.

▬ "A defendant challenging the sufficiency of the evidence bears a heavy burden[.]" *United States v. Pipola*, 83 F.3d 556, 564 (2d Cir.1996); *see also United States v. Gore*, 154 F.3d 34, 39–40 (2d Cir.1998). When reviewing sufficiency challenges, "we 'view the evidence in the light most favorable to the government, drawing all inferences in the government's favor'[.]" *United States v. Shareef*, 190 F.3d 71, 76 (2d Cir.1999) (quoting *United States v. Allah*, 130 F.3d 33, 45 (2d Cir. 1997)). An appellant must demonstrate

---

**1.** The government also charged Pomponio with one count of perjury in violation of 18 U.S.C. § 1621.

**2.** The following is an excerpt from Pomponio's SEC audiotape testimony at the moment when the SEC lawyer confronted Pomponio with evidence that he and Gannon had purchased the same stocks within a short period of one another:

Q: Our records reflect that Ms. Gannon purchased her stock at 8:59 a.m. on August 26, 1997.

A: That's the same day you're saying?

Q: The same day, a half-hour before you did.

A: You're kidding? I'm serious. You really have that?

Q: Yes.

A: I can't believe that. I mean I believe you, I'm not saying I don't believe you but that is sheer coincidence. That's the kind of stuff that I don't like. That is sheer coincidence.

that "no 'rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt.'" *United States v. Jones,* 16 F.3d 487, 490 (2d Cir.1994) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). We apply these principles equally to direct and to circumstantial evidence. *See Gore,* 154 F.3d at 40. Finally, we note that the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court. *See United States v. Friedman,* 998 F.2d 53, 56 (2d Cir.1993).

Measured against this high standard, we find that the evidence was insufficient as a matter of law on the conspiracy count, but sufficient to establish McDermott's conviction for the substantive offenses.

i). The Conspiracy Count

■ "[I]n order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal. The co-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." *United States v. Maldonado–Rivera,* 922 F.2d 934, 963 (2d Cir.1990) (internal quotations and citations omitted). We have frequently noted that the "essence of conspiracy is the agreement and not the commission of the substantive offense." *Gore,* 154 F.3d at 40 (citing *United States v. Abel,* 258 F.2d 485, 489 (2d Cir.1958), *aff'd on other grounds,* 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960)); *see also United States v. Walker,* 142 F.3d 103, 112 (1998). Additionally, it is a long-standing principle of this Court's law of conspiracy that "[n]obody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it; if later comers change that, he is not liable for the change; his liability is limited to the common purposes while he remains in it." *United States v. Peoni,* 100 F.2d 401, 403 (2d Cir.1938).

■ Despite this well-settled law, the government here asks us to redefine a conspiracy by its purpose, rather than by the agreement of its members to that purpose. The government argues that from the perspective of Gannon and Pomponio, albeit not from McDermott's perspective, there was a unitary purpose to commit insider trading based on information furnished by McDermott. According to the government, therefore, McDermott was part of the conspiracy even though he did not agree to pass information to both Gannon and Pomponio.

*United States v. Carpenter,* 791 F.2d 1024 (2d Cir.1986), *aff'd,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), forecloses the government's argument. In *Carpenter,* we reversed the conspiracy conviction of defendant Winans, a Wall Street Journal reporter who participated in a scheme with his friends Felis and Brant to misappropriate insider information and to use it for personal gain. *See id.* at 1026–27, 1036. Felis then passed the insider information to Spratt, who was not part of the original agreement. *See id.* at 1036. We reversed Winans's conspiracy conviction to the extent that it involved Spratt's trades. *See id.* at 1035–36. Because Winans's original trading agreement with Felis and Brant was narrowly limited to specific persons not including Spratt, about whom Winans had no knowledge, we found that by passing the information to Spratt, Felis had "'used the information obtained from Winans beyond the scope of the original agreement.'" *See id.* at 1036 (quoting *United States v. Winans,* 612 F.Supp. 827, 835 (S.D.N.Y.1985)).

In *Carpenter,* we left open three hypothetical avenues of liability against Winans.

First, we emphasized that Winans "might have been liable for the Spratt trades had the scope of the trading agreement been broader, to include trading by or for persons other than the small group of conspirators herein." *Id.* at 1036 (citing *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). Second, we noted that Winans might have been liable for the Spratt trades had the trades been " 'part of the ramifications of the plan which could ... be reasonably forseen [sic] as a necessary or natural consequence of the unlawful agreement.' " *Id.* (quoting *Pinkerton*, 328 U.S. at 648, 66 S.Ct. 1180). Third, we suggested that Winans might have been liable had he "at least known of the Felis–Spratt relationship." *Id.* (citations omitted).

Because none of these avenues of liability is applicable to this case, we find that McDermott is not liable for the trades made by Pomponio. There is no record evidence suggesting that McDermott's agreement with Gannon encompassed a broader scope than the two of them. McDermott and Gannon were having an affair, and it is not obvious that it was or should have been within McDermott's frame of reference that Gannon would share stock information with others similarly situated, or even that there existed others similarly situated. We decline to hold as a matter of law that a cheating heart must foresee a cheating heart. Indeed, the only evidence that McDermott did foresee or should have foreseen Gannon passing information to Pomponio. consisted of evidence suggesting that Gannon was a prostitute—evidence that the district court explicitly prohibited. Moreover, the proof at trial established that McDermott had no knowledge of Pomponio's existence.

Accordingly, we hold that, as a matter of law, no rational jury could find McDermott guilty beyond a reasonable doubt of a single conspiracy with Pomponio to commit insider trading. The government has failed to show the most basic element of a single conspiracy, namely, an agreement to pass insider information to Gannon and possibly to another person, even if unknown. We therefore reverse the judgment of conviction on that count.

ii). The Substantive Counts

■ In order to prove that McDermott committed insider trading, the government was required to show that McDermott passed material, non-public information to Gannon in violation of his fiduciary duties. *See United States v. O'Hagan*, 521 U.S. 642, 651–52, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *United States v. Cusimano*, 123 F.3d 83, 87–88 (2d Cir.1997). McDermott contends that the government failed to prove beyond a reasonable doubt the non-public element of the offense. We disagree.

■ Viewed in the light most favorable to the government, the evidence showed, *inter alia:* (1) that McDermott and Gannon were having an affair involving incessant telephone conversations; (2) that Gannon, who was up until this point an amateur trader, opened a trading account funded by monies given to her by McDermott; (3) that during the alleged conspiracy period, Gannon traded twenty-one times in twelve different stocks based upon McDermott's recommendations; (4) that Gannon traded in non-blue chip stocks, many of which were banks subject to non-public negotiations with KBW; (5) that Gannon was quite successful in her trading and in the timing of her trades; (6) that telephone conversations between Gannon and McDermott coincided with Gannon's trading activity; and (7) that Gannon shared her recommendations with Pomponio.

Although the government was unable to produce direct evidence of the content of any conversation during which McDermott transferred material, non-public information to Gannón, we find that rational minds could infer such a conclusion from the above evidence. Circumstantial evidence is a legitimate form of evidence in this Circuit, and in fact-intensive cases such as this, requiring careful examination of trading records and a myriad of public information, the jury is the appropriate body to determine a defendant's guilt or innocence. *See United States v. Morrison*, 153 F.3d 34, 49 (2d Cir.1998) (holding, in context of sufficiency challenge, that jury's choice of competing inference receives deference and that "[p]roof of the elements of the crimes charged may be entirely by circumstantial evidence"). Therefore, we hold that the evidence was sufficient to convict McDermott on the substantive offenses.

### B. Variance

McDermott argues that he was prejudiced to the point of being denied a fair trial as a result of the variance between the single conspiracy charged in the indictment and the proof adduced at trial. We agree.

We begin by referring to our foregoing discussion of the sufficiency of the evidence for the conspiracy count to note that there was a variance in this case between the single conspiracy charged and the proof at trial. We review the variance for its potential prejudicial effect on McDermott's trial for the substantive counts of insider trading.

 In order to reverse a conviction because of the existence of a variance, the variance must have caused the defendant "substantial prejudice" at trial. *See United States v. Johansen*, 56 F.3d 347, 351 (2d Cir.1995). In evaluating whether a defendant has been prejudiced by a variance, we consider several factors, including: (1) whether the court gave a *Pinkerton* charge; (2) whether statements of persons not in the conspiracy were used against the defendant; (3) whether there was prejudicial spillover due to a large number of joined defendants; and (4) whether any inflammatory or shocking evidence came in against the defendant. *See United States v. Berger*, 224 F.3d 107, 115 (2d Cir.2000); *Johansen*, 56 F.3d at 351–52 (finding substantial prejudice where only one of four factors met).

 We find here that there was prejudicial spillover due to joinder, even though there was only one defendant joined with McDermott. The fact that McDermott and Pomponio were tried together, in the absence of anyone else at the defense table, *increased* the prejudicial effect of Pomponio's testimony on McDermott's defense by channeling all references to a source of securities information entirely onto McDermott. Given that Pomponio and McDermott were on trial for conspiring to commit insider trading, that there was a large disparity between the government's case against Pomponio for perjury and its case against McDermott, that Ponponio could only be guilty on the substantive insider trading counts if McDermott also were guilty, and that McDermott conceded having given some public information to Gannon, the potential for spillover was substantial.

We have noted that proper jury instructions can diminish the likelihood of prejudice, *see United States v. DiTommaso*, 817 F.2d 201, 211 (2d Cir.1987), and that jurors are usually presumed to adhere to limiting instructions. *See United States v. Jones*, 16 F.3d 487, 493 (2d Cir.1994). However, we have also repeatedly stated that this presumption fades when there is an overwhelming probability that the jury will be called upon to perform humanly impossible

feats of mental dexterity. *See id.; United States v. Figueroa,* 618 F.2d 934, 946 (2d Cir.1980). Although the district court here provided the jury with standard limiting instructions, we find that under the circumstances of the case, where the prejudicial spillover was so overwhelming, they cannot be presumed to be effective.

In light of this prejudice, we reverse the judgment of conviction against McDermott, and we remand for a new trial on the substantive counts.

### C. Abuse of Discretion Under Rule 403

Recognizing the prejudicial effect that evidence of Gannon's occupation could have on some members of the jury who might regard it as "sleazy," the district court stated at a pretrial hearing that admission of testimony regarding Gannon's occupation would be "not just distracting and inflammatory but potentially essentially suggesting a predisposition on the part of men who were intimate with her to do something unlawful."

Despite this statement, the district court allowed the government to introduce evidence that Gannon worked as a dancer, model and actress under the stage name "Marylin Star" and that Pomponio believed that Gannon "knew a clientele of lawyers, stockbrokers, and such, high level people" and that she had obtained her stock trading tips from a "client" or a "boyfriend client."

McDermott argues that the district court abused its discretion by admitting evidence that Gannon worked using the screen name "Marylin Star" and that she had a collection of "clientele," because this information created an inference that Gannon worked as a porn star, a prostitute

and/or a paid escort—information that the district court agreed had no probative value and should have been omitted from trial. We agree that references to Gannon's clientele should have been excluded, but we disagree that the district court abused its discretion by admitting Gannon's stage name.

 We review a trial court's evidentiary rulings for an abuse of discretion, *see United States v. Khalil,* 214 F.3d 111, 122 (2d Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 326, 148 L.Ed.2d 262 (2000), and recognize that district courts enjoy broad discretion over the admission of evidence. *See United States v. SKW Metals & Alloys, Inc.,* 195 F.3d 83, 87 (2d Cir.1999) ("[e]videntiary rulings are reversed only if they are 'manifestly erroneous,' such that the admission constitutes an abuse of discretion"); *United States v. Salameh,* 152 F.3d 88, 110 (2d Cir.1998) ("[w]e will second-guess a district court 'only if there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally' ") (quoting *United States v. Valdez,* 16 F.3d 1324, 1332 (2d Cir.1994)). Moreover, when reviewing a Rule 403 ruling, we must review the evidence " 'maximizing its probative value and minimizing its prejudicial effect.' " *United States v. Rubin,* 37 F.3d 49, 53 (2d Cir.1994) (quoting *United States v. Arango–Correa,* 851 F.2d 54, 58 (2d Cir.1988)).

 The government offered a stipulation that Gannon was a model, dancer and actress who appeared in films under the name "Marylin Star." At an *in limine* hearing, McDermott accepted this stipulation in part and preserved an objection to the admission of Gannon's screen name.[3]

---

**3.** The government argues that McDermott failed to properly preserve his objection to the admission of Gannon's screen name. We disagree.

Under Rule 103(a)(1) of the Federal Rules of Evidence, a party must make a timely and specific objection to a ruling of evidence. We have held in this Circuit that sometimes a

Although the district court clearly stated that Gannon's appearance in adult films added no probative value to the case, it accepted the stipulation and found that the name "Marylin Star" did not necessarily suggest that Gannon worked as an adult film star.

While we may disagree with a district court's evidentiary ruling, our disagreement is not alone sufficient to reverse an otherwise rational, carefully considered and non-arbitrary decision. Reviewing the district court's ruling in the light that most minimizes its prejudicial effect, we find that the district court did not abuse its discretion in finding that the stage name "Marylin Star" does not, standing alone, necessarily imply that its user is an adult film actress.

■ The district court also rejected McDermott's pretrial motion to substitute the word "clientele" with a word or phrase such as "friends," "acquaintances" or "business acquaintances."[4] Although the

court warned that evidence of Gannon's occupation could be distracting and inflammatory, it did not believe that the word "clientele" necessarily suggested prostitution, because "[a]n actress can have legitimate clients, such as litigators, who need to learn how to act in court or who need voice lessons. So it's not beyond the realm of possibility that there could be legitimate clients."

Even when considered in a light that most minimizes its prejudicial effect, we fail to see how any rational juror presented with repeated testimony that Gannon— a model, dancer and actress with a sexy screen name—had numerous "clients" would not immediately speculate that she worked as a prostitute or paid escort. Similarly, we fail to see how such a juror would not immediately assume that McDermott's and Pomponio's respective relations with Gannon were within the context of that occupation. Although it may not be beyond the realm of possibility that Gannon had legitimate clients, a proper

party objecting to an evidentiary ruling involving potentially prejudicial testimony cannot rely upon an *in limine* objection because the trial court might be unable to balance the probative and the prejudicial values outside of context, without reference to a witness's actual testimony. *See United States v. Yu–Leung*, 51 F.3d 1116, 1120 (2d Cir.1995); *see also Rosenfeld v. Basquiat*, 78 F.3d 84, 90 (2d Cir.1996). This Circuit does not impose a blanket prohibition on preserving Rule 403 objections *in limine*. Rather, an evidentiary issue that is not contextually bound may be preserved *in limine* when it is (1) fairly presented to the court, (2) of the type that can be finally decided in a pretrial hearing, and (3) is ruled upon by the court without equivocation. *See Yu–Leung*, 51 F.3d at 1121. Moreover, we note that our conclusion accords with the 2000 Amendments to the Federal Rules of Evidence, which make clear that *in limine* objections are covered under Rule 103. *See* Fed.R.Evid. 103, notes.

We find that McDermott's *in limine* objection to Gannon's stage name satisfies the above three factors. He argued the issue to

the Court in a pretrial memo; because the issue of introducing Gannon's stage name was self-contained, it was of a nature to be finally decided; and, as both parties noted during the hearing, the court considered the motion carefully and clearly before rendering its final decision.

4. As with the evidence of Gannon's stage name, the Government contends that McDermott waived this argument under Rule 103 because he failed to renew his objection at trial. Applying the test in *Yu–Leung*, we find that McDermott preserved his objection *in limine* because the issue was not contextually-bound, and the court was able to balance its prejudicial and probative value *in limine*. *See Yu–Leung*, 51 F.3d at 1120. Here, McDermott fairly presented the issue to the court; because Pomponio's full SEC deposition testimony was before the court, the issue could be finally decided; and, conducting a thorough Rule 403 balancing test, the court made a clear determination rejecting McDermott's motion.

Rule 403 analysis requires a realistic balancing, not an examination of far-reaching possibilities.

Because we find that references to Gannon's "clientele" unfairly prejudiced McDermott by casting an illicit light on his relationship with her by suggesting that her occupation was of a "sleazy" nature, we find that such evidence should not have been admitted and should not be admitted at trial on remand.

### D. Other Arguments

In addition to his primary challenges, McDermott also argues that the district court violated his Sixth Amendment right to confrontation and that he was denied a fair trial because of the admission of evidence that Gannon had invoked her Fifth Amendment rights. We have considered McDermott's arguments on these points and find them to be without merit.

Finally, in light of our discussion of variance, we do not need to address McDermott's arguments that the district court abused its discretion in denying his motion for severance based on the "spillover effect" from the admission of Pomponio's SEC testimony.

### CONCLUSION

For the foregoing reasons, we vacate defendant's judgment of conviction on count one and remand for a new trial on the substantive counts.